UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

PATRICIA MCNULTY,              .    Case No. 2:19-cv-05029-AB
                               .
          Plaintiff,           .
                               .    U.S. Courthouse
     v.                        .    601 Market Street
                               .    Philadelphia, PA
THE MIDDLE EAST FORUM,         .
                               .    March 17, 2021
          Defendant.           .    8:41 a.m.

. . . . . . . . . . . . . .     (Via videoconference)


DISCOVERY HEARING
BEFORE THE HONORABLE DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        SETH D. CARSON, ESQ.
                          DEREK SMITH LAW GROUP PLLC
                          1835 Market Street, Suite 2950
                          Philadelphia, PA 19103

For the Defendant:        JONATHAN R. CAVALIER, ESQ.
                          COZEN O'CONNOR
                          One Liberty Place, Suite 2800
                          Philadelphia, PA 19103


Audio Operator:           JIMMY CRUZ

Transcribed By:           GILLIAN LAWRENCE, CET-255, CER-255
                          Lawrence Court Transcription & Video
                          P.O. Box 530790
                          DeBary, FL 32753
                          386.216.5921
                          www.lawrencecourttranscription.com
                          transcripts.lctv@gmail.com


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

1      (Court in session at 8:41 a.m.)

2              ...for Middle East Forum, Judge.

3              JUDGE DAVID R. STRAWBRIDGE:  Okay.  Thank you.  All

4  right.  Okay.  So the first time to have some of you folks on

5  the screen to see the -- to see the faces that are involved

6  here.

7              First off, we do have an ESR, Mr. Cruz.  You'll see

8  his face on the screen.  But very important at least at the

9  start is that when I address a particular lawyer, make sure --

10 unless I articulate the name clearly -- that you identify

11 yourself what is your -- if you are going to be speaking,

12 initially, at least the first two or three times.  I suspect

13 Mr. Cruz is a clever guy, he'll probably be able to figure out

14 the voices --

15             MR. JIMMY CRUZ:  Yes.

16             THE COURT:  -- pretty soon.  At least at the start,

17 let's do that because we need to make sure that we have a

18 transcript that is -- that is, you know, accurate.

19             MR. JIMMY CRUZ:  Thank you, Judge.

20             THE COURT:  Okay.  Who is going to be the principal

21 speaker for the plaintiff?  I assume you, Mr. Carson, is that

22 right?

23             MR. SETH D. CARSON:  Yes, sir.

24             THE COURT:  Okay.  Okay.  So here, obviously, I want

25 to go through a couple of things, which I think have some

1  bearing upon consideration of the difficulties that are here in

2  this -- in this case.  And I think a recounting, a brief

3  recounting, with respect to the timeline is appropriate as we

4  have gleaned from the -- principally from the docket.

5          My first involvement with this case was working as a

6  magistrate judge for Judge Brody back in April where she in her

7  normal course referred to me the obligation of talking to the

8  parties to see whether or not there was any interest in

9  settlement.  And we did have a preliminary conference with

10 respect to that in April of 2020.  And it was indicated that

11 -- I think it was indicated that it was a little too early for

12 us to be seriously discussing settlement at that time.  So I

13 backed away.

14          And then I came to be further engaged again in late

15 September at -- on occasions with respect to some document

16 requests that had been requests that had been served and some

17 -- defendants had alerted Judge Brody on September 29th

18 concerning a conference to try to resolve outstanding document

19 requests at least from the perspective of the Defendants on

20 discovery disputes.  And to -- next, at that point, not

21 specifically designated to handle discovery disputes but as

22 part of my -- my own view of my obligation, if we do have

23 discovery disputes that may have an impact upon the discovery

24 process as something I inquire into.

25          And I don't know if I did it on this occasion, but I

4

1  oftentimes will suggest to the parties -- I'll give you kind of

2  an informal read with respect to the discovery requests to see

3  if you can work together to try to get these requests

4  accomplished, not Judge -- not burden Judge Brody with it to

5  the extent that it may have some positive impact one way or

6  another with respect to moving the case forward, which, of

7  course, is my objective, and acting upon, you know, 15, 16

8  years of experience, which lets us know that it's like 97

9  percent of the cases that are brought in our court and most

10 courts around the country are settled.  So that's -- that was

11 part of my approach.

12        We had scheduled a status conference for September

13 29, where counsel for Plaintiff, Mr. Carson, failed to appear.

14 We then -- there was then an indication from Judge Brody

15 directing the Plaintiff to respond to Plaintiff's request for a

16 conference, resolve discovery disputes.  And then she extended

17 the discovery deadline, and I re-engaged in an effort to try to

18 see whether or not settlement was possible.  And in connection

19 with all that, ultimately, at the direction of Judge Brody back

20 in early December, to further inquire with respect to the

21 discovery disputes to see if I could be of any assistance in

22 resolving them.  That was October 29, 2020.  And, again, Mr.

23 Carson failed to appear and did not provide any indication as

24 to the reason or rationale for that failure, similar to what

25 took place a month earlier on September the 29th.

1          As the matter then progressed, or perhaps didn't
2   progress as -- as -- as it may have progressed had Mr. Carson
3   appeared, on December the 9th, Judge Brody did refer to me a
4   motion for contempt that had been filed by the Defendants, by
5   the Cozen people, filed by the Defendants.  And she referred
6   that matter to me to provide her with my report and
7   recommendation with respect to how that motion to contempt
8   should be resolved.

9          Okay.  So there was then further discussion and
10  ultimately led to -- and there was some briefing -- and
11  ultimately led to a decision on December 30th of 2020, my order
12  where I had found that the conduct that was engaged in by Mr.
13  Carson in connection with those -- those conferences before me
14  and also his failure to appear at a conference before Judge
15  Brody, did justify the issuance of the contempt order.  And
16  that was with an opinion docketed on December 30th, 2020.

17         The disputes continued.  There was a fee petition
18  that was filed, which was invited to be filed by me in
19  connection with having found the -- Mr. Carson in contempt.
20  And then there was a submission of some discovery responses and
21  -- and a response to the fee petition but an untimely response
22  of the fee petition, eight days beyond the deadline that had
23  been indicated.  I then -- then entered another order to the
24  extent that Mr. Carson had provided some responses as to
25  whether or not it would be appropriate -- or I did order that

1  the parties meet and confer on January the 27th on these

2  discovery issues.  And we had -- at that point in time, I

3  understood there had been some discussion or conversation

4  between the parties, and I called for a September -- it looked

5  like it was a September 28th conference.

6          And then, ultimately, it led to an order that came as

7  a result of the informal unrecorded telephone conference that I

8  had at that time on the 28th.  It led to an order of January

9  29th, I believe it's docket number 47, if I have it correctly,

10  where the parties were directed to file letter briefs setting

11  out with some particularity the particulars from the -- from

12  the -- from the perspective of MEF, who was the moving party

13  with respect to this motion at this point.  They were directed

14  to provide us with what we characterized as a letter brief.  We

15  got back a 27-page document that was more than brief.  It was a

16  fulsome document such as it was, and Plaintiff was obligated to

17  file a response to that by the January 29th order.  That was to

18  be due on February 12th.

19          Plaintiff failed to meet that deadline but ultimately

20  did provide a response on February 22nd.  That was followed by

21  a reply from the Cozen people on behalf of MEF on February

22  24th, and then a very prompt response from Mr. Carson on the

23  same day, dealing with a motion to compel which -- which he

24  filed as to outstanding discovery with respect to a -- a

25  discovery request that he had put to MEF and had not had any

1  response on.

2          There was a response -- then a response to that.
3  That's not before us today, but that was -- it would be -- it
4  will be dealt with in an appropriate time, but that's not part
5  of what our schedule is for today.  And I did understand
6  there's now been a further motion with respect to a failure to
7  respond to request to admit, which will be -- have to be dealt
8  with.

9          And let me say that it's been pointed out, and it is
10  the case, at the end of the opinion on the December 30th, I had
11  -- well, I was -- I had reflected a bit with respect to what
12  various options are.  These -- I find these discovery disputes
13  and trying to get the cooperation among parties that are in
14  vigorous litigation can be sometimes difficult.  I felt that
15  the conduct on the part of the Plaintiff's counsel at that
16  point was unjustified and unjustifiable.  But I was not -- I
17  was not prepared to make any -- the ultimate sanction, which
18  would be a dismissal of the case, at that time, primarily
19  because that, obviously, has an impact upon the party as
20  opposed to the lawyer.  And I don't know that that's
21  necessarily an appropriate way to resolve these things unless
22  it's an absolute last resort.

23          I did, however, put a caution in the bottom of the
24  last page of the opinion that I filed on December the 30th,
25  indicating a recognition of that factor in reference to the

1  guiding principles set forth in the <u>Poulis</u> case, it's P-O-U-L-

2  I-S case, by -- by the Third Circuit for us to be concerned

3  about, which I -- which I think is the guiding principle with

4  respect to this proposition.  And that -- that is an issue

5  that, as far as I'm concerned, is still in play.

6       All right.  So I think the appropriate way to deal

7  with this now, given where we are, is to go through.  I want to

8  get from Mr. Carson -- I want to try to get some clarity with

9  respect to some of the information that has been provided in

10  the letter that he had presented to me, which -- which MEF says

11  I shouldn't give consideration to because it was -- it was

12  untimely.  And there is local rules with respect to that, that

13  I would be -- fall within my discretion of not taking any

14  consideration of that.  I choose not to do that.  And I'm going

15  to look at it substantively.  It was filed acknowledging, of

16  course, that it was 10 days late.  Not a good sign, obviously,

17  from my perspective.  But nonetheless, it was what it was.

18       What I'm -- what I'm interested in here from Mr.

19  Carson, and I'm going to urge you -- I presume you guys have

20  all these documents readily available.  And for now, the

21  document I'm going to work off of is the February 22nd letter

22  from -- from Mr. Carson on Derek Smith letterhead.  And I just

23  want to get some clarity to some of the statements made to the

24  extent that the -- the statements of position that Mr. Carson

25  has made and the statements of position made by Mr. Cavalier

1  and other folks at Cozen who have been involved in this case

2  from that perspective are so diametrically opposed.  And I just

3  have great difficulty dealing with situations where it's -- you

4  know, one side says we did it.  The other side says we didn't.

5  And how am I meant to resolve that?

6         Well, there are ways in which we do resolve that, and

7  that's one of the things I want -- I want to find too.

8  Sometimes there's broad generalized kind of over-the-top

9  statements made that do not -- would not appear to me to have

10 any serious justification.  And I want to just try to get

11 through some of this and give Mr. Carson an opportunity to

12 respond.

13        So, first of all, in the beginning of the February

14 22nd letter, the letter states that -- that Mr. Carson believes

15 that the Defendant's letter, which would have been the letter

16 of February 5, misstates the history of discovery in this case,

17 as Plaintiff has responded entirely to Defendant's discovery

18 requests so that the Court should find that no additional

19 discovery be ordered.

20        So with respect to the statement of Defendant --

21 Plaintiff has responded to -- entirely to Defendant's discovery

22 requests, Mr. Cavalier, what's -- what is MEF's position with

23 respect to that statement.

24        MR. JOHN CAVALIER:  Your Honor, I'm sure that it will

25 -- by the way, Doug, for the reporter, this is John Cavalier

1   from Cozen O'Connor representing Defendants.

2           And this will come to as no surprise to Your Honor,

3   but we vigorously disagree with that statement.  There have

4   been 17 text messages produced in this case in an improper

5   format and a --

6           THE COURT:  Hang on -- hang on for a minute.  I'm

7   going to give you an opportunity to -- to go forward on some of

8   the specifics.

9           MR. CAVALIER:  Very well.

10          THE COURT:  And the -- and the business about these

11  text messages I understand is -- is in play.  I just want you

12  to give me a broad based, you know, example or examples with

13  reference to the examples of -- of places where you think that

14  you -- that -- that is sufficient to discount the

15  representation made by Mr. Carson that -- that the -- that the

16  Plaintiffs have responded entirely to Defendant's discovery

17  requests.

18          MR. CAVALIER:  Certainly.

19          THE COURT:  Something about text messages.  What's

20  that --

21          MR. CAVALIER:  Certainly, Your Honor.  We have gotten

22  17 text messages in an improper format and a partial production

23  of WhatsApp.  We have received no financial documents.  We have

24  received no emails.  We have received no tax returns.  We have

25  received no documents tending to show or disprove anything

1 related to Plaintiff's damages.

2         THE COURT:  Okay.

3         MR. CAVALIER:  So we disagree with that statement,

4 Your Honor.

5         THE COURT:  Okay.  So, Mr. Carson, would you like to

6 reply to what Mr. Cavalier has said?

7         MR. CARSON:  Sure.  With respect to -- TO financial

8 documents, the parties have done extensive discovery in this

9 case, including depo -- multiple depositions of the Plaintiff.

10 It's been confirmed that she's had no break between her job and

11 any --

12         THE COURT:  My -- my -- my understanding is, and my

13 intent was, to have Mr. Cavalier give me some response with

14 respect to the production of documents.  I'm not asking about

15 what your Defendant -- what your clients may have said at a

16 deposition.

17         MR. CARSON:  Well, I guess what I'm just saying is

18 there's no wage loss claim.  So there's no -- there are no --

19         THE COURT:  You haven't heard me, Mr. Carson.

20         MR. CARSON:  Okay.

21         THE COURT:  My question was, what -- what he said

22 with respect to documents that would bear upon, potentially, a

23 question of lost wages.

24         MR. CARSON:  They are not relevant to this case as

25 there is no wage loss claim.  There are no lost wages in this

1  case.

2        THE COURT:  Okay.  So are you now saying that to the

3  extent that in the complaint there's reference -- and I don't

4  know for sure, but I assume there's reference to some wage loss

5  or other economic harm by virtue of the misconduct that you've

6  alleged with respect to MEF, you know, serious allegations

7  which I suspect MEF is somewhat concerned about -- but in any

8  event, is it your -- is it your client's position as of now

9  that you're not making any demand for any economic loss --

10        MR. CARSON:  Correct.  She went --

11        THE COURT:  -- as a result of the separation?

12        MR. CARSON:  She went from one job to -- sorry to

13  interrupt, Your Honor.  She went from one job to the other and

14  made $20,000 more per year, so no.

15        THE COURT:  Okay.  So that is then off the table.

16        Is this the first time you've heard that, Mr.

17  Cavalier?

18        MR. CAVALIER:  It's the first time I've heard it that

19  concisely, Your Honor.  We -- while we have deposed Ms.

20  McNulty, we have not deposed her in this case.  So while she

21  has given us some testimony in that regard, that's the first

22  time that I've ever heard that so clearly stated.  And we'll

23  take that representation.  I would need to determine whether or

24  not any of these documents we requested are still relevant, but

25  we will take that representation for what it's worth.  It

1  doesn't --

2          THE COURT:  Okay.

3          MR. CAVALIER:  -- solve the other issues, but --

4          THE COURT:  No.  It is.  And I think it was -- I'm

5  not sure you said so directly, but apparently a motivation to

6  ask -- for -- for you to call for those kinds of documents, you

7  know, readily, easily obtainable, presumably, because you were

8  concerned about seeing if those documents would have a bearing

9  upon any wage loss claim.  And to the extent that's off the

10 table, then I would have to agree with Mr. Carson that it's not

11 going to be relevant, because he's not making a claim for that,

12 unless you have some other basis to believe you're entitled to

13 it.

14         MR. CAVALIER:  Your Honor, we would agree that to the

15 extent there's no wage loss claim, that documents relevant to

16 wage losses are not -- are not necessary in this case.

17         THE COURT:  Okay.  All right.  So the other comment

18 that's made here that I'm a little bit confused by is following

19 along the same opening part of that opening sentence in the

20 February 22nd letter is Defendants seek to prejudice Plaintiff

21 by notifying the Court about the discovery issues in a

22 completely different case.  Calling the matter of Lisa

23 Barbounis versus the Middle East Forum.

24         So to you, Mr. Cavalier, is the Lisa Barbounis case

25 completely different than the McNulty case in your view?

1          MR. CAVALIER:  Your Honor, we addressed this, at

2  least in part, in our February 5th letter to you.  Our position

3  is that it is not remotely different.  It -- we are having --

4  it involves the same type of claims against the same

5  defendants, the same universe of documents.  The plaintiffs all

6  are in communication with each other.  They all know each

7  other.  They all have conversations with each other back and

8  forth that are reflected in these documents.  And I think, most

9  relevantly, the issues that we are going through before Your

10 Honor with respect to this non-production of -- of both paper

11 documentation and electronic discovery are quite literally the

12 exact same issues that we had before Judge Wolson.

13         THE COURT:  All right.  We'll -- I -- we'll get to

14 that if we need to.  And --

15         MR. CAVALIER:  Fair enough.

16         THE COURT:  -- let's sort of put aside the question

17 about ESI.  With the exception of -- with the exception of Mr.

18 Gold appearing on the screen, I did not grow up in an area

19 where there was such a thing as ESI for us to be concerned

20 about as lawyers.  Paper discovery I understand.  Converting it

21 over to ESI, I need some education on.  It also demonstrates

22 how much younger Judge Wolson is than me for sure, because

23 apparently he knows a lot about ESI from what I am led to

24 believe, at least by virtue of what -- if he didn't know much

25 about it, he wanted to educate it on it, obviously, in

1  connection with this particular case.

2          So I'm just looking at this.  And so, I will say to

3  you, Mr. Carson, more in a general sense -- and I like to try

4  to keep this specific to documents where I can.  So apologies

5  for that.  But I do see certain places where you make reference

6  to similarities with Lisa Barbounis to the extent that you

7  produced documents, as I understand it, that go to Ms.

8  Barbounis that you submitted to the Cozen lawyers in connection

9  with the McNulty case.

10          And I think that you came back and you indicated that

11  you had even tracked some of the discovery responses that you

12  provided in the McNulty case based upon what had been done in

13  the Barbounis case.  I think Mr. Cavalier makes a particular

14  point with respect to some issue with respect to further

15  employment that was obtained by Ms. Barbounis with some

16  political person that was not -- was -- pertained to Barbounis

17  that was produced as part of the discovery in the McNulty case.

18  That seems to me would be not relevant to the McNulty claim,

19  but yet you included it in your discovery on the question of

20  the McNulty claim, ascribing it to a typo.

21          MR. CARSON:  What happened -- sorry, Your Honor.

22  Sorry.

23          THE COURT:  Go ahead.

24          MR. CARSON:  So it was only in the written responses,

25  Your Honor.  It was basically, I -- it was -- I had -- we

1  received the exact same I think it was 64 document requests.

2  So I had already set up the document responses, the written

3  responses in one case.  And I just -- I tried to use those to -

4  - to save time and track from it.  And I did searches and

5  replaced the names with the different names.  And I just -- I

6  didn't do a search and replace the name for the employer.

7  Everywhere where it said the employer, Curvis (Phonetic) and

8  Randy Weber it should have said Patricia McNulty's new

9  employer.  And I've since cured that.

10         THE COURT:  Okay.  So with this typo as you called

11  it, mistake as I call it --

12         MR. CARSON:  Mistake, yeah.  Mistake.

13         THE COURT:  -- was this -- did you learn about this

14  mistake as a result of some response from the lawyers for MEF?

15         MR. CARSON:  Correct.  Yes, Your Honor.  So I -- yes.

16  Yes.

17         THE COURT:  So would it be the case then that mistake

18  caused them to spend time and, therefore, client money for you

19  to go back and unravel that for them to -- to -- to present to

20  you the difficulty with respect to that and trying to get it

21  unraveled as to your leaving them to make a decision as to what

22  is related to Barbounis as opposed to you going through and

23  providing them with discovery on McNulty and McNulty only?

24         MR. CARSON:  Your Honor, no, I don't think that's

25  entirely accurate, because the -- the Defendants did not comply

1 with the judge's standing order or the -- or the entire idea

2 that discovery is supposed to be an amicable process where the

3 parties work together.  I never received a single phone call

4 from Defendant saying, hey, there's a mistake in -- in your

5 written responses that you might want to cure.  It would have

6 taken two minutes.  Or -- I mean, John and I text each other

7 all the time.  I could -- a 30-second text would have sufficed.

8          The only -- the first time I received any indication

9 of it was when Defendants circumvented the judge's standing

10 order and went right to the Court with motions.

11          THE COURT:  Mr. Cavalier, do you want to respond to

12 that?

13          MR. CAVALIER:  Your Honor, during the hearing before

14 you on January 29th, I believe, you were very specific.  And

15 you ordered us to present to you, in a letter brief, the issues

16 relating to discovery.  We follow orders on this side, and it

17 was important to us that we do that in this case.  That's why

18 we presented it in the way we did.

19          Beyond that, I will also say that I do find it to be

20 a little offensive when I'm getting accused of not abiding my

21 discovery violations when even a cursory review of this

22 document by anyone on the Plaintiff's side before it went out

23 the door would have revealed these obvious errors.  And it

24 doesn't seem proper or fair to me that the burden is shifted

25 from the Plaintiffs to us to correct these typos, as Mr. Carson

1  calls them, which, by the way, we have to had to deal with in a

2  variety of circumstances and a variety of different pleadings

3  in this case.

4          THE COURT:  All right.  There's also a reference --

5  and I'm now on the top of page 2 of Mr. Carson's letter of

6  December the -- sorry -- of the letter of February the 22nd,

7  where he states Plaintiff provided Defendants with a complete

8  table of contents, so that all discovery already produced could

9  be readily discerned from any new documents produced.

10         What say you to that, Mr. Cavalier?  It sounds like

11  it would be a helpful thing for him to be able to do.

12         MR. CAVALIER:  I agree with you that it would be

13  helpful, but that is not the way I understand what we got.

14         THE COURT:  Well, did you get anything labeled go to

15     you?  A table of --

16         MR. CAVALIER:  We have -- we have a chart of Bates

17  labeled documents with titles that we've had throughout the

18  process.  And we -- we discuss those in our February 5th filing

19  to you, in terms of what they relate to.  Our problem with that

20  was that a table of contents doesn't do us much good if the

21  entire table is reproduced in response to every single request.

22         THE COURT:  All right.  Take me to where in your --

23  where in your discussion about this appears in your February

24  5th letter.

25         MR. CAVALIER:  So if you have our letter in front of

1  you, Your Honor, the first time we discuss this issue is with

2  -- is in section A, beginning on page 2.  And you'll see -- if

3  you scroll down to part B at the bottom of page 3, the kitchen

4  sink, we give an example about their response to document 39,

5  where we ask a simple request for pictures involving one

6  person.  And we -- we get the entire table of contents

7  reiterated to us as a response.  So that -- we don't know if

8  those pictures exist, where they exist, where they might be

9  within that -- that table.  So, again, our position is really

10 simple.  It's just that a table of contents that -- that is

11 reproduced every time and in its entirety is really no table of

12 contents at all.

13         THE COURT:  Okay.  So did you or anyone else at Cozen

14 involved in this case pick up the phone and have a -- seek to

15 have any conversation with Mr. Carson to get a clarification

16 with respect to this?

17         MR. CAVALIER:  We have spoken many times about

18 discovery in this case, Your Honor, and about many issues.

19 Again, at this point, we were under court order to present

20 these issues to you.

21         THE COURT:  I understand that.  I understand that.

22 But the requests went out in January of 2020.

23         MR. CAVALIER:  Yes.

24         THE COURT:  Right?

25         MR. CAVALIER:  Yes.

1          THE COURT:  And the document that you mentioned, he

2    calls the table of contents, you characterize it somewhat

3    different, but perhaps there's something -- some close

4    connection between those two things, was -- did you -- when you

5    first saw that and recognized that this -- you didn't think

6    this was enough to satisfy the obligation, was there any effort

7    to try to get clarity as to that from Mr. Carson?

8          MR. CAVALIER:  Your Honor, I believe there was, and I

9    believe that effort has been ongoing throughout this process,

10   both in this case and in other cases.  We have made it clear

11   that our position is that this is an improper way to reference

12   documents, especially in response to a simple request like

13   this.

14          THE COURT:  I -- I agree -- I agree with you about

15   that but I'm just asking this question.  I mean, I agree with

16   you about that in terms of, you know, whether or not it was an

17   appropriate way to present the -- present the documents.  And

18   there's -- there's, you know, potential remedy for that with

19   respect to assessing costs against the Plaintiffs to the extent

20   of further effort that it might have required you folks to

21   respond.

22          But I think Mr. Carson makes a fair point when he

23   says something about not having had communications with you

24   with respect to this.  And I'm just wondering -- you know, you

25   make a generalized statement that you've had regular

1   communications.  He seems to say, yes, you do -- you have had

2   regular communications.  I think he just said you communicated

3   almost every day.  I'm not sure what time period all this was,

4   and how all this was going on, and how this all occurred.  But

5   I presume it would be very simple for Cozen people to go back

6   and to give me something that would show, yeah, you know

7   telecon -- telecon with Carson re discovery, you know, whatever

8   your entry was in your -- in  your bill.  I presume that's the

9   way you make -- present any bills to MEF.  That might help give

10  me a little bit of clarity with respect to that -- that

11  question.

12          MR. CAVALIER:  I am certain those exist, and we would

13  be happy to provide them to the extent you'd like them.

14          THE COURT:  Don't overwhelm me, but just give me

15  reasonable examples that go back in time.

16          MR. CARSON:  Your Honor, may I interject.

17          MR. CAVALIER:  I will do my best to be brief for Your

18  Honor.

19          THE COURT:  All right.

20          Go ahead, Mr. Carson.

21          MR. CARSON:  There's been zero meet and confer about

22  this issue.  There's been one time that the parties met and

23  conferred in this case in connection with discovery, and it was

24  pursuant to your order.  There has not been a single other

25  telephone conversation.  There hasn't been a single other time

1  that -- that Defendants reached out to me and expressed any

2  problem with any discovery in this case.  The only problem

3  during that telephone call that they -- that they represented

4  to me they had was with respect to these, you know, 13 text

5  threads that weren't produced in the quote/unquote proper

6  format, which, you know, we can discuss at your -- you know, as

7  you talked about, but there just hasn't been.  I mean, it's

8  just --

9            THE COURT:  No.  I'm going to assume --

10            MR. CARSON:   -- (indiscernible).

11            THE COURT:  I'm going to assume, just to help me with

12  respect to what contemporaneous documents might say or do to

13  resolve this dispute, is that you do not keep time entries.

14  You've got a case on a contingency basis.  And my experience

15  normally is that, under that circumstance, you wouldn't have

16  any real reason to keep the time carefully accounted for that -

17  - that the Defense counsels normally do when they're billing

18  their clients by the hour; would that be a correct assumption

19  here?

20            MR. CARSON:  I -- I don't -- I -- it's correct that I

21  don't keep it as meticulously as defendants, but the parties --

22  I do keep extensive records, including all the communications

23  between the parties.  And -- and there's been one time in this

24  case that we set up a conference to meet and confer about

25  discovery, and that was right before we had spoke to you in

1  January, and the only issue raised during that telephone call

2  was the text messages.

3           THE COURT:  Right.

4           MR. CARSON:  And if you'll remember, Your Honor, that

5  was the only issue discussed with you during the telephone

6  call.

7           THE COURT:  So I'm going to -- to having Maple be

8  taking, I don't know, good solid notes on this for the purposes

9  of where we go from here.  But I'm going to direct Mr. Cavalier

10 to give me the indications with respect to what are in his

11 records or his billings with respect to this question with

12 respect to meet and confer specifically, and maybe a little bit

13 -- little bit of a taste of it generally, as long as it's not

14 going to be particularly overwhelmed.  I don't know if -- how

15 detailed your -- how detailed your entries are, but let's --

16 let's see you get -- and I'll have that -- you produce that to

17 me and with a copy of it to Mr. Carson.

18          MR. CAVALIER:  I will do that.

19          THE COURT:  Okay.  So -- all right.  I think you've

20 already answered that.  And there's references in the letter

21 here, your letter of February the 22nd with respect to

22 discovery that you've not received.  That's not an issue before

23 us at this point.  All right.  So maybe you've covered -- maybe

24 you think you've covered this, but I'm looking where you state

25 specifically, Mr. Carson, and I'm looking at the -- at the

1  penultimate paragraph on page 2, the last paragraph before --

2  the full paragraph before turning on to page 3, and that is one

3  that starts "Plaintiff, Patricia McNulty, did not use personal

4  email."  So I want to get some clarity with respect to this

5  bracketed, and in particular, carrying on with this issue is,

6  "Defendants have not contacted Plaintiff to ask why those

7  emails were not produced by McNulty."

8           All right.  So I guess those emails -- let me just

9  ask you, Mr. Carson, those emails -- which of those emails are

10  you referring to in that sentence?

11          MR. CARSON:  Your Honor, I don't even know.  It's

12  just defendants have made this blanket representation that they

13  are sure that there's emails that she hasn't -- that haven't

14  been produced because they've seen them in other context or

15  something.  But like I said, because there's no been no

16  discovery, meet and confer, because the defendants have failed

17  entirely to comply with the Judge's standing order to discuss

18  these issues, I have no idea what they're talking about.  What

19  I can say is that if they tell me, I'm sure that I can address

20  it very easily and that we can work through this -- this

21  situation.  Ms. McNulty was meticulous in maintaining

22  separation.  So the difference between this case and Lisa

23  Barbounis, is that Lisa Barbounis did not keep a fine line

24  between her personal life and her work life.  Ms. McNulty did

25  and, therefore, she just doesn't have -- there's not any sense

1 of discovery in her email account.  It says --

2          THE COURT:  All right.  So you're telling -- let's --

3 let's talk about -- let's be clear about this.  So I presume

4 that Ms. McNulty had an email address through MEF; is that

5 right?

6          MR. CARSON:  Yes.  Yes.

7          THE COURT:  Okay.  And I presume she also had a

8 personal email address?

9          MR. CARSON:  She does.  She has the same personal

10 account today that she did then.

11          THE COURT:  Okay.  And I take it that you're -- I

12 think you've said, and I assume it to be correct, that she does

13 not have control over whatever emails there were that she would

14 have generated from the MEF account other than unless she's you

15 know, created them and -- I guess she could do it if she -- if

16 she was -- if she emailed something from her MEF account to her

17 personal account, then there would be some document about that.

18          MR. CARSON:  Correct.  And if that happens,

19 defendants would know that because they have access to her

20 email account.

21          THE COURT:  Yeah.  Okay.  All right.  I got it.  I

22 got it.

23          So, Mister -- all right.  Mr. Cavalier, can you

24 identify with particularity the request for emails and any

25 distinguishing or separation of emails from Ms. McNulty's

1  personal email address as opposed to emails from the ME -- her

2  MEF email address?  But let me just -- first of all, just to be

3  -- be clear, is the assumption correct that MEF does have

4  possession of any emails that she sent from -- during the

5  relevant time periods -- and I'm not exactly sure how far that

6  goes.

7          What was the date of her separation from the company?

8          MR. CARSON:  February 2017 to September 2019 were  --

9  are the dates of employment.

10         THE COURT:  What was the last date?

11         MR. CARSON:  September of 2019, I believe.

12         THE COURT:  Okay.  So during the time period,

13 Mr. Cavalier, has -- have you reviewed your client's email

14 address -- email -- email from Ms. McNulty's email from the MEF

15 account?

16         MR. CAVALIER:  We have, Your Honor.

17         THE COURT:  Okay.  So are you satisfied that you --

18 that you have all that?

19         MR. CAVALIER:  To the extent that we can tell, we're

20 satisfied with respect to her Middle East Forum work email

21 address.

22         THE COURT:  Okay.  You've also asked for -- have you

23 also asked separately for her personal email address?

24         MR. CAVALIER:  We have.

25         THE COURT:  Is it -- is it articulated in the request

1  that you made, maybe it's in one of these requests I think

2  you've copied over for me later in your later, that you wanted

3  -- that you were calling for the production of her personal

4  email account?

5           MR. CAVALIER:  I believe it is, Your Honor.  I'd be

6  happy to review it and identify that request for you, but I

7  believe that's correct.  I believe we're clear on what we're

8  looking for here, yes.

9           THE COURT:  Okay.  Well, let's -- I would like you to

10 do that.  That's -- Mr. Carson is saying, as I understand it,

11 that he never got such a request from you.

12          Is that what you're saying, Mr. Carson?

13          MR. CARSON:  No, I -- I would have to review the

14 request to know exactly how it was phrased, but I'm sure that

15 they ask -- they -- they want access to her personal email

16 account.  It's just that the -- the only thing they would have

17 a right to is emails that are relevant to this case.  They

18 don't -- I don't think even defendants are arguing that they

19 have -- they get access to her entire personal email account.

20          THE COURT:  Well, how do you -- how is the decision

21 made with respect to what's relevant to the case?

22          MR. CARSON:  I guess if there's emails that pertain

23 to the allegations that Ms. McNulty is making or her

24 employment.  I mean, I don't think that every, single email --

25 like if she has like a scam from sort of advertisement that MEF

1  sent to her email, I don't --

2            THE COURT:  No.

3            MR. CARSON:  -- think that's relevant.

4            THE COURT:  Yeah.  I completely agree with you.  But

5  I guess the question is, who makes the determination?  I'm

6  hearing you saying that you've made a determination on

7  Plaintiff's side that there's emails there that are not

8  relevant.  Mr. Cavalier might say that he thinks they are

9  relevant.  Maybe it doesn't say anything specific about anybody

10 associated with -- with MEF, but maybe she's saying I'm feeling

11 stress at work, or, you know, whatever, you know, around time

12 periods.  Somebody -- somebody who has experience with things

13 like that on a regular basis and things like that, it seems to

14 me, and I trust you would concede, would be relevant.

15           MR. CARSON:  Correct, yes, I would concede that.  I

16 just don't think -- I think any email from her personal account

17 has all -- has already been produced, and there are -- there

18 are no emails in her account that have any relation to The

19 Middle East Forum that haven't been produced.  I'd be happy to

20 have her double check.  I'm not going to -- I'm not going to

21 certify that, you know, with -- I would like the opportunity

22 just to double check.  But my client has looked at her account,

23 I have looked at her account, and we just haven't seen anything

24 in her account that's relevant to this case that hasn't been

25 produced.

1          THE COURT:  All right.  So, Mr. Cavalier, is this --
2     are there some places where you have seen through other
3     discovery emails that come -- that appear to you to come from
4     Ms. McNulty's personal account?

5          MR. CAVALIER:  Yes, Your Honor.

6          THE COURT:  All right.  Can you explain about the
7     time period that they were involved, and do you find that those
8     are -- are any of those are emails that you believe are
9     relevant to the question with respect to, you know, her work at
10    MEF?

11         MR. CAVALIER:  So we received a very voluminous
12    production at the end of our long saga with Judge Wolson and
13    those discovery issues from Plaintiff Barbounis.  and in that
14    data set, after parsing it and analyzing it and so on, we have
15    -- for a production that was made by Mr. Carson on behalf of
16    one of his clients, we have emails from Patricia McNulty
17    containing both emails, chat transcripts, and other things that
18    are personally controlled by her.  They're not MEF phone
19    numbers, they are not MEF email addresses, but in her personal
20    file that are clearly relevant to this case.  And we -- our
21    concern, Your Honor, is that did Mister --

22         THE COURT:  When you say clearly relevant, tell me
23    why -- you know, pick out a couple of them, why they're -- why
24    it's relevant.

25         MR. CAVALIER:  They -- the plaintiffs are -- for

1  example, the plaintiffs are speaking amongst each other about

2  their work, about their boss.  There are -- there are

3  voluminous messages back and forth between the plaintiffs where

4  they complain about every, little thing under the sun except

5  sexual harassment.  Those kind of things are -- that's sort of

6  like proving a negative, Your Honor, but those are highly

7  relevant to us as we try to show that, you know, here -- here

8  is a plaintiff who, for example, is complaining about not

9  getting credit for a work assignment or complaining about not

10 being taken to lunch when somebody else was.  They complain

11 about everything, but nothing about the core relevancies in

12 this case.

13          So those are difficult to find, Your Honor.  I will

14 concede that.  Because you're not going to find them by

15 searching for sexual harassment, or even The Middle East Forum,

16 in a digital data set.  But they are the kind of clearly

17 relevant documents that are critical to our ability to build a

18 defense in this case.

19          THE COURT:  Okay.

20          MR. CARSON:  Your Honor, can I just respond to that

21 really quickly?

22          THE COURT:  Yes.

23          MR. CARSON:  So I have no idea what John is talking

24 about -- what Mr. Cavalier is talking about right now.  Like

25 there -- there are not voluous -- voluminous messages and

1  threads on her personal email account.  They don't exist.  And
2  we didn't produce those in any other case.  And if Mr. Cavalier
3  thinks that they exist, I would -- I would ask him to please
4  just call me and the defendant and just tell me where they are
5  so we can go find them and get them to him.  I mean, it sounds
6  like he already has them, so I'm not sure what the -- we're
7  even arguing about anymore.  But -- but this information is not
8  on her personal email account, and I would challenge
9  Mr. Cavalier to demonstrate that it is.

10         THE COURT:  All right.  Mr. Cavalier, I'm going to
11  ask you to accept that challenge and give me -- but you need to
12  give me some examples.  You know, don't -- I'm not going to
13  look at all this discovery, that's for sure.

14         MR. CAVALIER:  I wouldn't subject you to that, Your
15  Honor.

16         THE COURT:  Examples that you believe would be
17  properly characterized as relevant to the litigation between
18  McNulty and MEF.  And it may well be that it would pertain --
19  if similar conduct occurred to Ms. Barbounis, it may well be
20  that there would be something, you know, with respect to
21  Barbounis, and some -- you know, some reference to similarities
22  may -- may make something relevant.  I don't know.  It would
23  depend.  And I'm not, you know -- depending upon how we're
24  going to go about this in the end of this -- end of the day,
25  but, you know, for now, if you're going to carry on with this,

1  I'm going to -- we'll get that in order, then I'm going to have
2  you give me no more than -- no more than 15 emails that pertain
3  to this that will be such and such, that we can determine the
4  date upon -- you know, upon which the emails would have been --
5  would have been sent and responded and ones that would come
6  from the personal account.  All right.  Are we -- are you with
7  me on that?

8            MR. CAVALIER:  I am, Your Honor.

9            THE COURT:  And then you'll copy them to Mister --
10  Mr. Carson as well.

11            All right.  So the other -- the other thing -- yeah.
12  Okay.  So the other thing was there was some reference that
13  Mr. Carson made in the letter that, while there had been no
14  meet -- meet and confers, according to him, he did indicate
15  there was a call with the parties to discuss the text threads.
16  So I want to hear a little bit about that and the text threads.
17  So what was it that was the nature of that dispute,
18  Mr. Cavalier, from your perspective?

19            MR. CAVALIER:  So, Your Honor, as we laid out in our
20  February 5th filing, the issue is the format of -- and the
21  fulsomeness of that production.  We got 17 text message threads
22  which are essentially the entirety of the production that
23  Ms. McNulty has made.  They are not in a very useful format for
24  us.  We are not able to load them into our various tools that
25  we use here.  So as a result, we have to manually review each

thread, which is -- which requires manpower which is expensive
and which makes it difficult for us to determine whether or not
these text threads are actually the entire production.  I don't
know how they were produced.  I don't know how Mr. Carson and
his client went about getting those text messages off the
device that Ms. McNulty uses.

But as I like to say, this is the -- this is the
equivalent of printing out an email and putting it in envelope
and sending it to us.  That gives us the text on the page, but
we need more than that.  We need -- we need the metadata.  We
need the -- the underlying parent-child relationships preserved
in that metadata to be order to -- in order to be able to see
the attachments that were sent by plaintiff or that were
received from plaintiff, the image files that were sent back
and forth, the -- the voice memos that were sent back and
forth.

And instead we're essentially seeing a static image
of these text messages.  And as we went through, again, not to
bring in the other case, but as we went through in painstaking
detail with Judge Wolson, and as Mr. Carson, himself, has
recognized in motion to compel that he's filed in this court
seeking this exact same kind of data from other defendants,
it's clearly relevant.  It's clearly producible under the
Federal Rules, and we're clearly entitled to it.

THE COURT:  What was the -- what was the precise

1  manner in which you made the request for text messages?

2          MR. CAVALIER:  The precise manner, Your Honor?

3          THE COURT:  Yeah.  I mean, there's -- there's

4  something in the Rules that talk about the question as to

5  whether or not they -- how far you -- the one who's on the

6  receiving end of the request and the one who's expected to make

7  the -- make the production as to how far that entity has to go.

8  If it's kept in the same format that is utilized by the -- by

9  the provider, that's certainly acceptable, or other native

10 format I think is the language that's referred to in the Rule,

11 and I'm not exactly sure what all that means to be honest.  But

12 what's the question with respect to formatting?  My --

13          MR. CAVALIER:  We requested it in native format, Your

14 Honor.  And like I said, Mister -- if Mr. Carson wants to

15 represent that Ms. McNulty keeps her text messages in a printed

16 file in her desk drawer, and that's the only way she keeps

17 them, then, fine, I will take that representation.  But if

18 these text messages were pulled off of her digital device and

19 produced to us as PDF's, we're entitled to them as they were

20 natively on her phone as we requested them.

21          THE COURT:  Okay.  So -- so that's the reference with

22 respect to the threads.  Somebody sent a text message, somebody

23 responds, that response might generate a reply, that reply

24 might generate another reply, that's what you're talking about?

25          MR. CAVALIER:  Precisely.

1              THE COURT:  Are you telling me that you only have

2    paper copies of -- of one, single screen shot at a time?

3              MR. CAVALIER:  We have -- we have the digital

4    equivalent of a -- of paper copies of the threads.  So we have

5    PDF files of each thread.  So each cell -- so if -- Your Honor,

6    if I'm talking to you via text message and you're talking back

7    to me via text message, that's a thread.  If I talk to

8    Mr. Carson via text message, he talks back to me, that's a

9    second thread.  So we have 17 of those threads in PDF format,

10   which is the digital equivalent of a printed copy without

11   metadata, without native information, without -- without the

12   embedded files that are -- that are in those threads.  So, for

13   example, in native format, if I send you a photograph and you

14   produced the native format, I can click into that and I could

15   see what you sent.  With a PDF you cannot do that.  It's a

16   small, little thumbnail.  You can't tell what's what.  You just

17   lose all of that interconnectedness that makes it as useful.

18             THE COURT:  Yeah.  Okay.  So, again, if we want to

19   carry this through, I mean, you -- when you say 17 text

20   messages, it sounds as if it's not particularly voluminous.  Is

21   it voluminous?

22             MR. CAVALIER:  We don't believe it is, at least in

23   terms of the way these -- these plaintiffs tended to

24   communicate with each other.  But, again, if it's only 17 text

25   message threads that are in Ms. McNulty's possession, custody,

1 and control, I will -- I will take that representation from

2 Seth, Mr. Carson.  But what I can't take is documents produced

3 in an improper format that I can't use.

4          THE COURT:  Right.

5          MR. CAVALIER:  I care more about the format so long

6 as I'm getting a representation that the production is

7 complete.

8          THE COURT:  All right.  So it sounds like that you

9 are -- I'm very hesitant to do this, but to you and Mr. Carson,

10 perhaps, need another meet and confer with respect to this

11 specific question, this specific --

12          MR. CAVALIER:  Your Honor, on that note, I will say,

13 and I think Mr. Carson would agree with this, we have met and

14 conferred precisely on this issue, and unless -- I don't want

15 to put words in Mr. Carson's mouth, but I just believe we have

16 an irreconcilable difference of opinion in terms of what needs

17 to be done here.

18          THE COURT:  Do you agree, Mr. Carson, about that?

19          MR. CARSON:  It might be, yes, Your Honor.  I just

20 don't agree with a single word that Mr. Cavalier just said.  So

21 the text messages --

22          THE COURT:  Not a single word.

23          MR. CARSON:  Well, of how the -- about that they're

24 not produced in the right format, and that they deserve to have

25 them in the format that they want.  Your Honor, we -- they are

1   in the native format.  The -- every, single text that she sent

2   -- and we didn't hold anything back.  We -- there wasn't one

3   message that we redacted.  There wasn't one thread that we said

4   we're not going to give them this.  If there was a person she

5   communicated with about MEF, we sent the entire thread in

6   chronological order so that every, single attachment, every,

7   single image is viewable.  You can see the time, date --

8               THE COURT:  Okay.

9               MR. CARSON:  -- every, single thing was sent.  There

10  is -- there's no better format that can be produced.  And it's

11  the same format in which they produced their threads to us.

12              THE COURT:  Hang on, Mr. Carson.  Hang on.  So you're

13  telling me that this is -- these are paper documents that you

14  sent to him; is that right?

15              MR. CARSON:  No, it's electronic, Your Honor.

16              THE COURT:  What -- Mr. Cavalier, what's -- is it

17  electronic or is it paper?

18              MR. CAVALIER:  Your Honor, it's electronic in the

19  sense that it is a PDF.  But a PDF is just a digital equivalent

20  of a printed piece of paper.

21              THE COURT:  Yeah.  Okay.  All right.  So --

22              MR. CAVALIER:  Your Honor, if I --

23              THE COURT:  -- we'll -- we'll deal with this in a

24  subsequent order.  I mean, if it turns out that we have to --

25  you know, we're going to carry on with this, I'm going to ask

1 you to show me, you know, specifically, you know, how and why

2 this situation occurs and give me some basis to believe that

3 there would be something further with respect to this.

4          MR. CARSON:  One other issue that I think is

5 relevant, too, is the defendants described --

6          THE COURT:  Wait -- wait a minute, Mr. Carson,

7 please.

8          MR. CARSON:  Sorry, Your Honor.  Sorry.

9          THE COURT:  You understand what I'm asking you for,

10 Mr. Cavalier?

11          MR. CAVALIER:  I do, Your Honor.  And I do just want

12 to note, also, on this point that I'm -- I have a concern based

13 on what Mr. Carson just said, which is that we gave it -- which

14 is a quote, we gave them everything having to do with MEF, and

15 that's how they produced these threads.  I'm -- I have a

16 concern that they simply searched for The Middle East Forum and

17 produced whatever came back, and that's, again, going to be

18 another issue and another insufficiency that we might have to

19 tackle depending on how this goes.  But maybe we can leave that

20 for another time.

21          MR. CARSON:  I can address that now.  That is not

22 what we did.  We did not use search terms.  We -- we looked

23 through every, single person she ever sent a text message to,

24 and if the person was related to MEF, then we produced the

25 entire thread.  There was no search terms.  We literally gave

1  them everything.

2          MR. CAVALIER:  I think we might have a difference of

3  opinion on what everything means, but --

4          MR. CARSON:  Well, I mean, unless you want her text

5  messages with her mom and her sister, you know what I mean,

6  like her family.

7          THE COURT:  Is that --

8          MR. CAVALIER:  I might --

9          THE COURT:  Wait.

10         MR. CAVALIER:  -- depending on what they say.

11         MR. CARSON:  Okay.  All right.  Well, yeah --

12         THE COURT:  So --

13         MR. CARSON:  -- you still haven't answered them.

14         THE COURT:  -- tell me -- tell me how Judge Wolson

15  resolved this issue, Mr. Cavalier.

16         MR. CAVALIER:  He ordered -- after voluminous

17  briefing and multiple hearings and contempt orders, he ordered

18  the documents produced in native form.

19         THE COURT:  And was it done?

20         MR. CAVALIER:  Ultimately, after about a month after

21  that order and after Mr. Carson and I went back and forth, in a

22  technical sense, yes, it was ultimately done.  And it was a

23  very -- I mean, it was -- it was critical as well because we

24  received -- having finally received that information, that --

25  Your Honor, and, again, I don't want to belabor the other

1 cases.  But it was absolutely critical to our ability to defend

2 this case, which is one of the reasons why we're insisting on

3 it now.

4        MR. CARSON:  How?  How was it critical?

5        THE COURT:  Okay.  All right.  So I want to -- I'm --

6 I will have -- you know, you'll have to answer that particular

7 question as part of the -- part of the exercise.  But we'll

8 give you an order with respect to that.  It may well be a

9 prompt to meet -- meet and confer on this with a specific

10 delineation of it's hard to get some of these things done

11 specifically.  But specific delineation as to, you know,

12 exactly how this would -- how this works, exactly what the

13 response is.  I'm interested in what -- what a colleague did in

14 very similar type case, as I understand it.  So that's

15 something that we're going to have to -- we're going to have to

16 put off for now.

17        MR. CARSON:  And, Your Honor, can I just mention

18 something with regard to the way Judge Wolson handled it?

19        THE COURT:  Sure.

20        MR. CARSON:  So this issue wasn't presented in that

21 case in any similarity.  In Judge -- in Judge Wolson's

22 situation, we had produced snip-its from test threads based on

23 key-word searches.  And Judge Wolson ordered that the entire

24 threads needed to be produced.  There -- there was not a

25 situation in Judge Wolson's case were we had produced the

1 entire threads and defendants just decided they didn't like the

2 format, and they wanted to use a computer program.  And,

3 therefore, he -- Judge Wolson said, oh, well, you have to go

4 hire a restoring vendor to appease their particularities.

5 That's not what happened in Judge Wolson case.

6          In Judge Wolson case, if there was a hit on a key

7 word, then you only saw the sentence where that key word was

8 in, and Judge Wolson said -- his order was, you have to produce

9 the entire thread.  We already did that in this case.  So this

10 is not comparable to Judge Wolson's situation.

11          THE COURT:  All right.  Well, I'll be able to make

12 that judgment myself, although I don't think -- I don't think

13 Judge Wolson had a -- had a specific written opinion with

14 respect to his rationale, but I understand that he made

15 reference to oral argument that he had.  So we'll --

16          MR. CARSON:  There's a transcript, too, I can provide

17 you, Your Honor, of the hearing.

18          THE COURT:  I think that might be -- that might be

19 appropriate to do, Mr. Carson.  So we'll take you up on that.

20          Mr. Cavalier?

21          MR. CAVALIER:  Just briefly, Your Honor.  I'm quoting

22 from -- from Judge Wolson during that hearing.  And here's --

23 here's what he says, and I'm going to be very brief.

24          "Here's the thing.  Ultimately it's not my problem,

25          okay?  It's your problem how you get the defendants

42

1              the data to which they're entitled.  But they are

2              entitled, not just because of my order, but because

3              of the Federal Rules of Civil Procedure, to the

4              metadata that will allow them to the parent/child

5              relationships of electronically stored information

6              that you have produced."

7         That is the exact issue of which I am complaining to

8    you now in this case.  Hence --

9         THE COURT:  Was it -- was the characterization of the

10   request that you made identical to the request that you made in

11   the McNulty case?

12        MR. CAVALIER:  Identical.  Native format with

13   metadata.

14        THE COURT:  Okay.

15        MR. CARSON:  Your -- Your Honor, the one thing about

16   that, though, is that there -- there is no instance where

17   defendants even once have used metadata in this case.  They

18   just filed a motion for summary judgment in Judge Wolson's

19   case.  There isn't one example where any metadata was ever

20   used.

21        THE COURT:  All right.  Well, I'm not -- I'm not -- I

22   can't comment about that.  I don't --

23        MR. CARSON:  Okay.  Well, I'm just saying, to -- to

24   ask that Lisa -- Patricia McNulty take on the burden of

25   spending, you know, possibly tens of thousands of dollars to

1  reproduce text threads that will look the exact same as they
2  way they've already been produced just seems overly burdensome.
3          THE COURT:  All right.  Well, I will -- assuming we
4  go this route, I will make that determination based upon the
5  submission that's provided by Mr. Cavalier and what it is that
6  you -- how you would respond to it.
7          MR. CARSON:  Thank you, Your Honor.
8          THE COURT:  Okay.  Okay.  So we divided this up into
9  certain categories, some of which we've covered here now; some
10 of which I want to ask you a little -- a few more questions
11 about.  There's a -- there's a specific allegation from
12 Mr. Cavalier that -- I mean, if there's reason to believe based
13 upon production received in parallel cases, that relevant
14 documents exist pertaining -- documents specifically relevant
15 to McNulty exists from some of the production.  So I'd like you
16 to give me the basis for that belief, Mr. Cavalier.
17         MR. CAVALIER:  So, Your Honor, the production that we
18 received in January in the Barbounis case that is a result of
19 the conferences before Judge Wolson that we just talked about
20 ultimately resulted in a very large data dump on us in native
21 format that we were able to use, predominantly produced, to
22 Mr. Carson's ultimate credit in that case, that we were then
23 able to load and review.  And in the process of preparing for
24 summary judgment in the Barbounis case, and reviewing those
25 documents, which were extremely voluminous given the nature of

1  the way they were ultimately produced to us, we found various

2  communications between and amongst Plaintiff McNulty and others

3  that are highly relevant to this case.

4         THE COURT:  What -- what was the content of those --

5  generally, the content of high -- those documents you say were

6  highly relevant to this case?

7         MR. CAVALIER:  They were communications talking about

8  the genesis of the lawsuit, the conversations amongst and

9  between the plaintiffs when they were contemplating their

10  reasons for suing before going out and finding a lawyer, before

11  filing their EEOC charges.  They referenced their -- their

12  decision to quit their jobs at The Forum, and the reasons for

13  it.  They referenced their emotional state and other various

14  stressors in their respective lives.  There -- it's high --

15  they're highly relevant, Your Honor.  I don't know any other

16  way to put it to you than --

17         THE COURT:  Well, what you've articulate to me would

18  -- if it's -- if it's, in fact, the case, would -- would

19  incline me to say, yes, it is highly relevant.

20         MR. CAVALIER:  Your Honor, just one last thing on

21  that point.  There's also an issue in both this case and the

22  Barbounis case pertaining to a text message -- and bear with me

23  here while I step through this -- a text message sent from Lisa

24  Barbounis to Patricia McNulty involving -- involving a very

25  critical event in these cases from the spring of 2018.  Okay?

1  So Ms. Barbounis sends a text to Trish McNulty.  Ms. Barbounis

2  sent the bulk of those text messages from her phone.  She later

3  reaches back out to Ms. McNulty and says, hey, did you save

4  those text messages?  I might need them.  And then, ultimately,

5  she somehow gets those screen shots back from Ms. McNulty, and

6  then relies upon them in her case.  We would very much like to

7  see the mechanics of how that information was sent back and

8  forth between the two, even if just pertaining to custody

9  purposes so that we can verify that it's authentic, verify the

10 dates that it was sent back and forth, and so on.  So that's

11 another very critical piece of this, from our perspective, on

12 the defense.

13        THE COURT:  Okay.  And was that subject matter

14 discussed at any deposition of Ms. Barbounis or Ms. McNulty

15 that may have taken place?

16        MR. CAVALIER:  Yes, Your Honor.

17        THE COURT:  And to what effect?

18        MR. CAVALIER:  So Miss -- Ms. McNulty apparently lost

19 her phone that contained -- this is what she says in her

20 deposition -- lost her phone that contained these messages

21 sometime very close in time to when the -- the initial

22 complaints in this case were made to my clients internally.  So

23 we're not really sure how she managed to recover those, and

24 other information that predates the loss of the phone.  So

25 we're in a situation here where she says I lost my phone, I

1  don't have anything from back then, but she does have some

2  things from back then and not others, and we're just not sure

3  why.

4             THE COURT:  Okay.  Fair enough.

5             Mr. Carson, I presume you wanted to comment about

6  this.  Let's make it brief, though?

7             MR. CARSON:  I -- I don't.  I -- just to say that

8  this is the perfect reason why the Judge's standing order to

9  meet and confer about these issues.  The -- the only other

10  thing is, is that the text threads that they're talking about

11  were produced by defendants to plaintiffs months -- months

12  before any of this all happened.  So they already have them,

13  and they've already provided it to the plaintiff.

14             THE COURT:  All right.  Well, we'll wait to see what

15  Mr. Cavalier comes up with.  We don't -- this will be referred

16  to in our order.

17             MR. CAVALIER:  Happily, Your Honor.

18             THE COURT:  Assuming that we go this route.

19             Okay.  Yeah, we talked about this.  We talked about

20  this.  All right.  So I think that covers that.  Let me -- let

21  me do one other topic, and then I will take a little -- I'll

22  take a very brief break and then come back in and finish up.

23             So, Mr. Carson, you are aware, I'm sure, of the --

24  from the -- from the recounting that I gave in the beginning of

25  this discussion and from, I'm sure, your own -- your own review

1  of the order, the cost amount was articulated, you know, with

2  respect to some of what we -- what we found to be contemptuous

3  conduct that led to our December 30th order.  So following upon

4  that, and following upon the discussion we had, I believe it

5  was, January the 28th, memorialized in, I believe, it's docket

6  number 47, which was the -- an order that makes reference to

7  the January 28th phone call but is dated January 29th, for very

8  specific and particular ways upon which we wanted to work to

9  try to get this thing resolved.  Mister -- I gave you dates to

10 do it.

11         Mr. Cavalier presented a very lengthy document.

12 Unfortunately, apparently, I didn't impose a page limit on all

13 this, but it was a lengthy document that goes through, and a

14 lot of it was recounting specifically what some of the

15 particular questions were, which was helpful to me because it

16 was easier to go through this instead of trying to dig out

17 wherever it would be we would find these things.  And your

18 response to it was to ignore it for a period of 10 days before

19 there was a response filed.  That indicates further lack of

20 compliance with these discovery orders.  It puts the parties to

21 further work, further effort that needs to be undertaken.  And

22 why should I not take Mr. Cavalier's recommendation, the

23 appropriate way to handle this is to dismiss it for these --

24 for these continued violations demonstrating the same kind of

25 conduct that took place that was the subject matter of the

1  order of the -- well, not the precisely the same, because that

2  was related to failure to even appear at conferences that were

3  scheduled.  But now we have, you know, delay, failure to

4  provide response for -- for a period of 10 days with -- you

5  know, with -- you know, with frankly a lot of more generalized

6  statements as opposed to some of the particularity that we've

7  even discussed here now.  So answer me that question.

8        MR. CARSON:  Your Honor, I guess, first, I'd like to

9  apologize for the -- for the late entry.  The reason for it is

10  kind of silly and serious at the same time.  My -- my

11  paralegal, when he was setting it on my calendar, the order --

12  your order said that the date when defendants -- defendants'

13  letter was due, and he didn't -- you know, when you look at the

14  email, and he didn't download the document and readdress the

15  email and put everything on the calendar.  And so it was -- it

16  just -- it was mis-calendared.  And this is the reason that

17  Catherine Smith has entered her appearance on this case, to

18  make sure that nothing like this happens again in this case.

19  She's going to help me with just, you know, the discovery in

20  this case.  She's going to help me with -- with hearings, and

21  she's going to help to, obviously, to see this case through to

22  where there's no more delay in any possible way.

23        Just addressing some of the other things that you

24  said earlier, though, Your Honor, about a missed hearing with

25  Judge Brody.  There was a hearing with Judge Brody in September

1  which I -- I appeared at that hearing.  The two missed hearings

2  were with Your Honor.  The first one, I -- I -- it was because

3  of technical difficulties.  If you'll recall, I called you

4  about five or ten minutes after the hearing, and -- and finally

5  got through to you, and the -- and it -- it went really fast

6  because there was no -- the parties had already agreed going

7  into this there would be no discussion about settlement.

8         And -- and the second one was, I was in a deposition

9  on these cases where some of the lawyers on these cases

10 appeared at the deposition, and I guess some of the other

11 lawyers appeared on the phone with you.  I -- I don't have

12 anyone else to appear on the phone, and, Your Honor, I -- to be

13 perfectly candid, I knew about it.  My plan that morning was to

14 try to stop the deposition and take the call with you and get

15 back in the deposition.  But like some -- I guess, you know, I

16 don't know -- you know, I guess this -- the main -- like the

17 way to put it like my ADD kicked in.  It's like sometimes you

18 get into a deposition and things start rolling and it's like a

19 time warp, and you -- and, you know, I just -- we were going

20 through it, and I looked at the clock and it was just after the

21 hearing.  And I -- and I'm just -- and I apologize, Your Honor.

22        But, you know, I don't think there will be a -- just

23 saying the amount of discovery and how far we are into this

24 case, you know, I think -- I don't think the parties intend to

25 even take any other depositions.  And if they do, I think they

1 would be very, very, very targeted to only specific issues in

2 this case that -- that haven't already been discussed.  But the

3 parties agreed, during all the depositions in this case where

4 I've done six and they've done -- you know, I don't even know

5 how many, that -- that we were going to allow each other to --

6 to ask questions about all these cases to try to streamline

7 everything.  And so --

8          THE COURT:  So -- so are you telling me that, as to

9 the second status conference for me, which I think was October

10 29, if I recall correctly, that that -- that day, at that time,

11 there was a deposition that was ongoing in this case?  Was

12 anybody --

13          MR. CARSON:  In the --

14          THE COURT:  -- representing MEF there at the

15 deposition?

16          MR. CARSON:  Correct.  It wasn't -- it was in this

17 group of cases.  I think it was in the Barbounis -- it was for

18 Bar -- one of the Barbounis ones, but, yes, Your Honor.

19          THE COURT:  Okay.  And -- and was the person -- who

20 was the Cozen party that was there?

21          MR. CARSON:  I -- I don't recall.  I recall that Bill

22 -- Mr. Rieser from Sydney Gold's office was present.  I think

23 John was present at that deposition, too, but he can absolutely

24 correct me if I'm wrong.

25          THE COURT:  No, I mean, did -- I mean, usually, and

1  this is not uncommon to have status calls occur late in the

2  day, is when I usually schedule them, to minimize any

3  (Indiscernible 9:47:55) and other activities during the body of

4  the day for counsel.  But when the counsel are merely together,

5  usually it facilitates quite easily when people getting in,

6  having conversations with Judge for just a short status

7  conferences.  It seems to me that would be all the more reason

8  why it seems inexplicable that, you know, you're not able to be

9  there.  You're telling me that whoever the Cozen lawyer was

10  there that day representing on behalf, a different Cozen lawyer

11  was apparently on the call.

12        MR. CARSON:  That's exactly what happened, Your

13  Honor.

14        THE COURT:  Okay.  Mr. Cavalier, can you shed any

15  light on this?

16        MR. CAVALIER:  Unfortunately, Your Honor, I cannot.

17  I was not in that deposition at least as best as I recall, and,

18  frankly, I was not part of the status conference with Your

19  Honor, either.  So I can't help you there, unfortunately.

20        MR. CARSON:  Your Honor, I can -- I can go on the

21  calendar and tell you exactly what deposition it was and it's

22  easy to find who was there.  But like, you know, I guess the

23  point is, is that I'm not telling you that I -- I didn't appear

24  because of the deposition.  I'm just saying, you know --

25        THE COURT:  I know that.

1          MR. CARSON:  What I'm saying is that I just got

2    wrapped up in this deposition and time just went by and I just

3    missed it.  And like -- and if -- you know, there's no -- you

4    know, I apologize.  It certainly wasn't -- it was not

5    intentional and I -- I apologize, but, you know, I guess if all

6    the lawyers were there, we would have all had to stop the

7    deposition, but because they have six lawyers and I have one,

8    you know, they -- they were able to handle the two different

9    appointments that day at the same time, where I -- I can only,

10   you know, do one at a time.

11          THE COURT:  All right.  So, Mr. Cavalier, do you want

12   to -- you know, you don't need to tell me what's in your

13   papers.  I got it, what's in your paper.  And I think you've

14   even recounted, and I don't know -- I think what you've

15   recounted was all based upon what is written documents, both

16   from the Brady case and the Barbounis case.  To the extent

17   you've indicated within your memo to me, the last part of the

18   memo to me is that you -- or your letter to me is, in some --

19   or in someway to assist in support of your position that the

20   case should be dismissed, that you articulated that there were

21   similar discovery disputes both before Judge Kearney and also

22   before Judge Wolson.  You told me a little bit about the ones

23   before Judge Wolson.  And Judge Kearney's case, I understand,

24   have been voluntary withdrawn; is that -- is that right?

25          MR. CAVALIER:  Yes, Your Honor.

53

1      THE COURT:  Okay.  All right.  Well, if you want
2  anything further, I'll give you an opportunity to do that, but
3  I'll try --

4      MR. CAVALIER:  Your Honor, I do, and I will be brief.
5  And I just want to say two things.  First off, I do -- I see
6  what is happening here with respect to Mr. Carson who now
7  claims he -- he has a paralegal who made an error and who --
8  who now has assistance on this case.  The concern I have is
9  that we have been in exactly this position before.  Before
10  Judge Kearney, his supervisor, Samuel Wilson, came down to
11  court and said, I'm supervising Mr. Carson on all his cases
12  now.  Judge, this kind of thing won't happen again.  That was
13  nine months, and as you can see from our February filing, a
14  whole lot of conduct ago.  So that's -- that's number 1.  And
15  then beyond that, Mr. Carson has had scheduling issues in these
16  other cases where he has also blamed his paralegal.  So I have
17  a concern that this -- this kind of conduct that is prejudicing
18  my clients you're -- is not going to be corrected going
19  forward.  Let me just say that.

20      Secondarily, and perhaps more importantly, I'd like
21  the Court to know that, you know, I am not pushing for the
22  dismissal of this case because I'm trying to be punitive to
23  Mr. Carson or his client.  The issue, Your Honor, is that I --
24  I have a client here who is defending itself and it's
25  reputation against these allegations that they vigorously and

1  vociferously deny.  And from their perspective, and I can

2  understand this, frankly, they're asking me, you know, we

3  didn't file this lawsuit; McNulty -- Ms. McNulty did.  We

4  aren't pursuing these claims; Ms. McNulty is.  Why do we have

5  to follow the rules and nobody else does?  Why do we have to

6  spend these tens of hundreds of thousands of dollars in order

7  to get these cases moving when the other side doesn't.  And --

8  and, Your Honor, so I'm left in the position trying to explain

9  to my client, hey, you know, even if we get this to trial, and

10 even if we win, it's still a pyrrhic victory for you because

11 you're going to be out this hundreds of thousands of dollars

12 and I can't recover that for you.  The best I can do is get you

13 a not liable verdict.

14         On the other hand, my opponents -- and, frankly, it's

15 very effective as a litigation strategy, to flaunt deadlines,

16 to not respond to filings in due course, to not produce

17 discovery, and ultimately, as long as they can goose the case

18 along to trial and recover anything, they get to recover all of

19 their fees.  So I'm in a position here of having to explain to

20 my client, hey, the deck is stacked against you, and no matter

21 what you do, even if you win, you're still going to lose.  And

22 that's -- that's an untenable and offensive position for me to

23 be in, Your Honor, and I just wanted to make the Court aware of

24 why the motivation for our papers and for our argument in this

25 context.  I like Mr. Carson.  It's nothing to do with

1  Mr. Carson.  I'm trying to protect my client's rights.

2             THE COURT:  All right.  I understand that.

3             All right.  We're going to take a break now.  Maple,

4  put us into the chambers room.  If we have a chambers room.

5             MR. CARSON:  Yes.  Yeah.  So --

6             THE COURT:  You guys can just stay -- you guys, if

7  you want, I can put you in separate rooms.  Maybe I should do

8  that.

9             MR. CARSON:  I mean, we can all just turn off our

10 videos, Your Honor, and just stay here if you want.

11            THE COURT:  Yeah, that's fine.  I just want to spend

12 a little bit of time with me.

13            MR. CARSON:  How long -- how long do you want us to

14 be back in?

15            THE COURT:  Ten minutes.

16            MR. CARSON:  Okay.  Thank you, Your Honor.

17            THE COURT:  Ten minutes.  That's all.

18            MR. CARSON:  Okay.

19            THE COURT:  All right, Nate.

20            THE CLERK:  Okay.

21            THE COURT:  Meanwhile, let's put them in separate

22 rooms anyway.  Let's at least have that option.  I don't want

23 to --

24            THE CLERK:  Yeah, I think that's easier.

25            THE COURT:  Yeah.  So, Mr. Rieser -- Mr. Rieser and

1 Mr. Gold and Mr. Cavalier would all be together.  They're

2 pretty much joined on this, as I understand; is that right?

3                MR. CAVALIER:  That's right, Your Honor.

4                UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5                UNIDENTIFIED SPEAKER:  Right.

6                THE COURT:  And you're -- you've got clients down

7 here I understand.

8                UNIDENTIFIED SPEAKER:  Correct.

9                THE COURT:  So -- so just put you and me, Nate, with

10 -- and Jimmy in with us.

11                THE CLERK:  Okay.  Everyone will need to accept the

12 invitations this first time.

13                THE COURT:  It will be plaintiff's room, defendants'

14 room, and camera's room.

15                THE CLERK:  Yes.

16                UNIDENTIFIED SPEAKER:  Are we off the record, Judge?

17 I'm sorry.

18                THE COURT:  Yes, we're off the record.

19                UNIDENTIFIED SPEAKER:  Okay.  Thank you.

20                THE COURT:  Don't be sorry.  Thank you.

21                (Court in recess from 9:54 a.m. to 10:18 a.m.)

22                THE COURT:  All right.  It's all in a particular

23 order -- discovery order.  I want to -- I want us to identify

24 some things and have Nate make sure I've got it right with

25 respect to where we go from here.  Clearly, we need to clarify

1  the business with respect to the substantial group of

2  documents.  I guess what I would characterize as sort of the

3  alleged over-production of information.  I think it is right to

4  the extent that the bottom of page 2 of the Cozen letter of the

5  25th of February make reference, as I -- as I understand it, to

6  all of these documents are identified as responsive to each of

7  these specific requests that are identified in the last

8  paragraph of the February 25th letter.  And so it is -- that's

9  insufficient and it will be ordered for the plaintiff to

10 delineate that further, and then for Mr. Cavalier to respond to

11 that delineation, and to have it be by way of a meet and confer

12 to the extent that the defendants here are unable to resolve

13 resolution of it, at least have it narrowly.

14       The questions with respect to the social media, the

15 LinkedIn, the WhatsApp, and the Facebook business, we're going

16 to require Mr. Cavalier to provide a reason to ration -- the

17 justification for why and how it is that we believe that there

18 is information that would be relevant to this particular

19 dispute appearing on the LinkedIn pages and/or around the time

20 of this discussion.  I assume you don't want to make it over a

21 two-year period.  But let's just say, you know, something like

22 in the last six months, and say in six months prior to and two

23 or three months after, perhaps, the separation of Ms. McNulty

24 from the company, to let us know how and why it is that you

25 believe that there is some identification of Ms. McNulty having

1  used the social media accounts.  And at that point, that will
2  be reviewed, Mr. Carson may have some opportunity.  And then we
3  will look at the most productive way and inexpensive way in
4  order to have that discovery effectuated.

5       To the extent that -- I don't think that it's an
6  unreasonable assumption to think that if these -- if these
7  folks are involved in social media on a regular basis and
8  having this difficulty at work, you know, one might expect that
9  there would be some probable cause to believe there may be some
10  comment there.  Clearly, there's going to be lots of stuff
11  that's not going to be related to this particular case.  So I'm
12  going to leave it to whether or not there are establishing
13  search terms in some way to give Mr. Cavalier and -- and Mister
14  -- and Mr. Carson to delineate circumstances that would be more
15  specific with respect to the utilization of those social media
16  pages.

17       The question with respect to the -- to the -- to the
18  threads on the emails, I understand it to be of a matter of
19  formatting that is the difficulty.  And I got the sense that --
20  from Mr. Cavalier, that there were -- or they were able to be
21  utilized to some extent in the for -- in the format in which
22  they have been presented.  And I'm going to want something --
23  some further specific information which we didn't find in this
24  particular letter, but some more specific information as to how
25  and why it is -- where -- how are you able to demonstrate that

1  there's reasonable basis to believe there would be something in
2  these -- in these threads beyond what has already been produced
3  to you in the way in which it has been produced to you.  And if
4  that -- and if that is -- you know, if there's a chance to have
5  to able to do it, then there will be an order or direction --
6  assuming that this part of the case moves forward, there will
7  be an order or direction for Mr. Carson to make that happen.
8         Now, let me just say this.  As you know -- you
9  fellows know, and if you didn't know I'll tell you, that my
10 work is largely taken up with settlement work.  The Court now
11 is assigning different judges to -- to me for -- and I'm
12 particularly busy with respect to settlement work.  But Judge
13 Kearney and Judge Baylson and Judge Wahlberg are principal
14 judges I'm working with now because they're low on magistrate
15 judges.  We have to take over some other -- we have to take
16 over some other -- other judges.  I don't know whether or not
17 there's been any possibility of any settlement talks or
18 discussions there might be with respect to the status of what
19 we've -- what we're talking about here and what the plan has
20 been so far here.  It might be necessary and appropriate for
21 the parties to give consideration to -- to having a settlement
22 conference.  I don't think it's for me to preside over a
23 settlement conference given my involvement in these discovery
24 disputes.  But I would see to it that another magistrate judge
25 would be assigned to -- to, you know, preside over a settlement

1   conference if -- if the parties think that there is a

2   reasonable basis to do it given some of the usual risks and

3   benefits with respect to the status of discovery in this case

4   and, you know, one way, obviously, to eliminate some of the

5   expenses that have been incurred already, and further expenses

6   that may have to be incurred in connection with that.

7           So I will want you to talk about that internally, and

8   then I'd like each -- each of you, Mr. Carson and Mr. Cavalier,

9   just to respond independently and to whether, yes, you -- you

10  think it might be productive, or, no, you think it would not be

11  productive.  Let's just respond separately, and I'll take those

12  two responses together and -- and I will take action based upon

13  how I interpret those responses.  That actually might be having

14  a conversation with you all together before I would make a

15  request that -- or that the -- I guess, Judge Brody would be

16  the one to make the request back to Judge Green to -- to assign

17  another magistrate.

18          Anything else on the -- what we talked about that you

19  think you want to mention?

20          UNIDENTIFIED SPEAKER:  I think you covered pretty

21  much everything, Judge.  One thing that I would be interested

22  to hear, Mr. Carson, Mr. Cavalier, just quickly is, I know in

23  these instances where there have been the alleged over

24  production where we talked about it, as Mr. Carson had said in

25  the entire table of contents and response to document requests,

1  I think in the February 22nd letter you had mentioned,

2  Mr. Carson, that you had reached out to Mr. Cavalier to try to

3  remedy that problem.  I'd like to -- I'd be interested to hear

4  if that has been resolved.  Judge Strawbridge just said we're

5  going to order you to testify -- testify which documents are

6  actually responsive to each individual request.  If that's

7  already been done, that would be helpful to know.

8          THE COURT:  We can respond individually to that now,

9  Jonathan, if you have -- if you care to.

10         Mr. Cavalier?

11         MR. CAVALIER:  So, Your Honor, I will simply respond

12 by saying it has not been resolved.

13         THE COURT:  Okay.  That was a response.  Not the

14 (Indiscernible) response, but nonetheless it is a response.

15         Okay.  So that's all I have on -- on this.  Give me,

16 within the next day or two, response to my comment with respect

17 to whether or not you'd like a settlement conference, and then,

18 otherwise, you'll probably have, from us, an opinion -- an

19 order -- or an order anyway -- I'm not sure how much of an

20 opinion it would be, but an order with respect to these issues

21 that we've identified and talked about here today.  And I --

22 and hopefully you'll have that by the end of next week,

23 something like that.  So thank you very much, gentlemen and

24 ladies.  We are adjourned.

25         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

1            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3            (The proceeding concluded at 10:27 a.m.)

4                  * * * * *

5               **C E R T I F I C A T I O N**

6            I, Gillian Lawrence, court approved transcriber,

7 certify that the foregoing pages 1 to 22 is a correct

8 transcript from the official electronic sound recording of the

9 proceedings in the above-entitled matter, and to the best of my

10 ability.

11

12      *Gillian Lawrence*

13

14 _____

15 GILLIAN LAWRENCE, CER-255, CET-255      DATE: MARCH 19, 2021

16               **C E R T I F I C A T I O N**

17            I, Tami S. Mayes, CET-547, court approved

18 transcriber, certify that the foregoing pages 23 to 62 is a

19 correct transcript from the official electronic sound recording

20 of the proceedings in the above-entitled matter, and to the

21 best of my ability.

22

23     *Tami S. Mayes*

24 _____

25 COURT TRANSCRIBER           DATE: MARCH 19, 2021